IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RJF INTERNATIONAL CORPORATION, | ) ) ) | CASE NO. 5:12 CV 1348 |
| Plaintiff, | ) ) | JUDGE |
| vs. | ) ) ) | JUDGE LIOI |
| WALLCOVERINGS INTERNATIONAL, INC., *et. al.*, | ) ) ) ) | PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| Defendants. | ) | |

MAG. JUDGE LIMBERT

## I. INTRODUCTION

Defendant Wallcoverings International, Inc. ("WCI") was Plaintiff RJF International Corporation's ("RJF" or "Plaintiff") exclusive distributor of wallcovering products and related items for a multi-state territory. Defendants, Frank Bain ("Bain") and Ronald E. Warfield ("Warfield") are senior executives of Defendant WCI and former consultants to Plaintiff RJF. National Wallcovering, Inc. ("National") is RJF's direct competitor.

RJF is engaged in the manufacture, sale, and distribution of wallcovering products and related items, components, accessories and supplies throughout the United States and internationally. From January 1, 1994 until April 1, 2009, WCI was RJF's exclusive distributor for Southeast Texas, Alabama, and the Western Florida Panhandle. In 2009, RJF purchased back from WCI the distribution rights to a number of its wallcovering product lines, with WCI retaining the right to distribute a few lines of product. As part of the 2009 transaction, Bain and Warfield agreed to continue, pursuant to Consultant Agreements, as consultants for RJF and

WCI, Bain, and Warfield executed a Non-Competition, Non-Disclosure, and Non-Solicitation Agreement.

In March 2012, RJF purchased from WCI the rights to distribute the remaining product lines retained by WCI as part of the 2009 transaction. WCI, Bain, and Warfield, again, signed a Non-Competition, Non-Disclosure, and Non-Solicitation Agreement as part of the 2012 transaction.

In April 2012, RJF became aware that National, its direct competitor, moved into WCI's Houston, Texas warehouse showroom that was previously used to sell RJF product. As part of the transaction between WCI and National, the phone numbers (including the 800 number and business line) used for RJF business was transferred to National instead of RJF, thereby diverting customers and potential customers away from RJF to National. National also hired WCI's showroom manager, customer service representative, and a warehouse employee. Moreover, WCI's files and computers that likely contain RJF's confidential information, such as customer orders and histories, pricing information, and price lists were still in place and operational.

As part of the 2009 and 2012 Transfer Agreements, WCI, Bain, and Warfield executed Non-Competition, Non-Disclosure, and Non-Solicitation Agreements that prohibited their misappropriation and use of RJF's confidential information and that restricted their ability to compete, directly or indirectly, with RJF's wallcovering business. WCI, Bain, and Warfield's work with National creates the real threat of improper and unfair competition with RJF by diverting RJF's customers to National by utilizing the phone numbers previously used for RJF business and exploiting RJF's confidential business (trade secret) information. To prevent the continuing irreparable harm caused by this threat, RJF seeks immediate injunctive relief to ensure that: (1) its trade secrets are returned by Defendants and that they do not make any use,

disclosure or further misappropriation of such information, and (2) to stop Defendants from, directly or indirectly, soliciting RJF's clients and using such information in an attempt to divert those clients from RJF and do business with National.

## II. STATEMENT OF FACTS

RJF's success rests in substantial part upon its development and ownership of certain trade secrets and other confidential business information (collectively, the "Confidential Information"). The Confidential Information includes, but is not limited to, information related to pricing, customer contacts and business needs and preferences, and other similar competitive and sensitive information, including confidential business information relating to RJF's new product development and marketing plans. The Confidential Information is valuable in that it provides RJF with a unique competitive advantage and the information has independent economic value to RJF because it is not known to RJF's competitors or generally within the industry.

RJF has expended significant time, effort, and money in the acquisition, creation, maintenance, and protection of its Confidential Information. This considerable expense mandates that this information not be made public, or RJF will lose the valuable competitive advantage it has developed based on the Confidential Information.

Because RJF possesses Confidential Information, it uses reasonable means to safeguard the confidential and secret nature of such information, including, but are not limited to: (1) restricting access to specific customer-related information to employees and distributors on a need-to-know basis; (2) password protecting sales and purchasing related information as well as product formulas; (3) creating business policies that specifically reference the importance and mandatory nature of not disclosing the Confidential Information, which employees and business

partners acknowledge in writing they have received and read; (4) creating business practices that require employees to shred necessary marketing information; (5) conducting exit interviews; (6) providing and controlling access to and retention of company computers, phones and technology devices containing confidential information; and (7) restricting access to promotion and pricing methods and information concerning products and services and their development and formulations.

On January 1, 1994, WCI entered into a Wallcovering Distributor Agreement to become RJF's exclusive distributor of wallcovering products and related items for multi-state territory comprised of Southeast Texas, Alabama, and the Western Florida Panhandle. (*See* Wallcovering Distributor Agreement attached hereto and incorporated herein at Exhibit 1). The Wallcovering Distributor Agreement had an initial term of one year, was automatically renewable from year to year, and could be terminated by either party by providing 90 days' advance written notice prior to the renewal date.

Even though RJF had the right to simply terminate the Wallcovering Distributor Agreement with 90 days' advance notice prior to its renewal date, in April 2009 RJF re-purchased its distribution rights from WCI with regard to a number of its wallcovering product lines. This transaction was memorialized in an April 1, 2009 Product Distribution Responsibility Transfer Agreement ("2009 Transfer Agreement"). (*See* 2009 Transfer Agreement attached hereto and incorporated herein at Exhibit 2). As reflected in the 2009 Transfer Agreement, RJF paid WCI $1,100,000.00 in four equal installments of $275,000.00 to acquire the distribution responsibility for the transferred wallcovering product lines. RJF paid WCI the last installment of $275,000.00 on April 1, 2012. (*Id.* at ¶2).

As part of the 2009 Transfer Agreement, Defendants Bain and Warfield entered into Consulting Agreements with RJF; and WCI, Bain, and Warfield entered into a Non-Competition, Non-Disclosure, and Non-Solicitation Agreement ("2009 Non-Compete Agreement"). All three of these agreements are dated April 1, 2009. (Copies of the Bain Consulting Agreement, the Warfield Consulting Agreement, and the 2009 Non-Compete Agreement are attached hereto and incorporated herein respectively as Exhibits 3, 4, and 5).

For consulting on behalf of RJF, Bain and Warfield each received $83,333.00 per year. The Consulting Agreements expired on April 1, 2012. Paragraph 5 of Bain's and Warfield's Consulting Agreements, titled "Disclosure of Information" provide as follows:

> Disclosure of Information. Consultant shall not disclose or appropriate to his own use, or to the use of any third party, **at any time during or subsequent to the term of this Agreement, any proprietary or confidential information of Company** of which Consultant becomes informed during such period, whether or not developed by Consultant, including, but not limited to, information pertaining to customer lists, pricing to customers, names of suppliers, etc., except as required in connection with Consultant's performance of this Agreement or as required by a governmental authority. Upon termination of this Agreement, Consultant shall promptly deliver to Company all manuals, notes, notebooks, reports, and all other materials of a proprietary or confidential nature or under the control of Consultant. Company shall have the right to obtain injunctive relief for violation of the terms of this Section 5, and the terms of this Section 5 shall survive the term of this Agreement.

In Paragraph 1 of the 2009 Non-Compete Agreement, WCI, Bain and Warfield acknowledged that they had access to and had become familiar with RJF's Confidential Information with regard to the Transferred Business. As a result, in Paragraph 2 of the 2009 Non-Compete Agreement, WCI, Bain, and Warfield agreed as follows:

5

WCI and WCIA and Bain and Warfield each acknowledges and agrees that the protection of Confidential Information is necessary to protect and preserve the value of the Transferred Business. Therefore, **for a period of seven years after Closing, WCI and WCIA and Bain and Warfield each hereby agrees not to disclose to any unauthorized persons or use for its or his own account or for the benefit of any third party any Confidential Information without RJF's written consent**, unless and to the extent that the Confidential Information is or becomes generally known to and available for use by the public other than as a result of WCI and WCIA's or Bain's or Warfield's fault, or as otherwise required by law.

Furthermore, in Paragraph 3(a)(i) of the 2009 Non-Compete Agreement, WCI, Bain, and Warfield agreed that they would not "directly or indirectly…be employed by, associated with in any manner connected with, or render services or advice or other aid to…any person engaged in or planning to engage in the (non-paint) commercial wallcovering or (non-paint) wall protection manufacture, wholesale or retail business (the "Transferred Business"),…." In addition, Paragraph 3(a)(ii)(D) provides that WCI, Bain, and Warfield will not "induce or attempt to induce any customer, supplier, or other person to cease doing business with RJF or in any way interfere with the relationship between any such customer, supplier, or other business entity and RJF."

As contemplated in the 2009 Transfer Agreement, RJF in 2012 purchased from WCI the distribution rights to those RJF products, i.e. the Retained Products, it did not purchase as part of the 2009 Transfer Agreement. Specifically, pursuant to a Product Distribution Responsibility Transfer Agreement dated March 30, 2012 ("2012 Transfer Agreement"), RJF purchased the distribution rights for RJF's line of dry-erase wallcoverings and Tac Wall® and related product lines from WCI for $600,000.00 in three equal installments, only one of which has been paid at the time of the filing of the instant suit. (*See* 2012 Transfer Agreement attached hereto and incorporated herein at Exhibit 6).

As part of the 2012 Transfer Agreement, Defendants WCI, Bain, and Warfield entered

6

into a Non-Competition, Non-Disclosure, and Non-Solicitation Agreement dated March 30, 2012 ("2012 Non-Compete Agreement"). (*See* 2012 Non-Compete Agreement attached hereto and incorporated herein at Exhibit 7). The operative provisions of the 2012 Non-Compete Agreement and the 2009 Non-Compete Agreement are substantially similar.

Sometime in April 2012 RJF was advised by a local Houston area painting contractor that National had moved into WCI's Houston, Texas warehouse showroom. Subsequent to learning this information, RJF discovered that WCI transferred the phone numbers used for RJF's business to National instead of transferring the numbers to RJF, or cancelling them, thereby diverting customers and potential customers away from RJF and to National.

Brian McCloskey, RJF's Regional Manager, went to WCI's facility and confirmed that National is now leasing WCI's Houston, Texas operation and has hired WCI's showroom manager, customer service representative and one warehouse employee. (*See* Affidavit of B. McCloskey attached hereto and incorporated herein at Exhibit 8). McCloskey, who was a frequent visitor to and regularly worked out of WCI's warehouse, observed that all of WCI's files and computers were still in place and operational. (*Id.* at ¶3). These files and computers are believed to contain RJF's customer orders and histories, pricing information, and price lists, all of which is RJF's Confidential Information.

Moreover, contrary to the express terms of their Consulting Agreements, Bain and Warfield have failed to return to RJF all manuals, notes, notebook, reports, and all other materials of a proprietary or confidential nature or under their control. Bain and Warfield may have turned this information over to National or allowed WCI's former employees that are now working for National to do so.

On May 18, 2012, RJF notified National, WCI, Bain, and Warfield of its concerns that

7

National was in possession of RJF's Confidential Information and that WCI, Bain, and Warfield were violating the confidentiality and restrictive covenants of the various agreements referenced herein. (*See* Letters to WCI, Bain, Warfield and National attached hereto and incorporated herein at Exhibit 9). As of the date of this filing, only Bain responded. (*See* F. Bain Email attached hereto and incorporated herein at Exhibit 10). In his response, Bain conceded that the 800 number used for RJF business was transferred to National and that National refused to suspend usage of or relinquish the number. In addition, Bain provided no assurances that WCI's former employees were required, as a condition of employment with National, to sign confidentiality agreements acknowledging that they were not permitted to share with National RJF's Confidential Information, such as, but not limited to, customer orders and histories, pricing information, and price lists. And, Bain's response provided no indication as to when WCI's computers and business records were removed from the showroom it is now leasing to National.

### III. ARGUMENT

The Court should consider several factors when deciding whether to issue RJF its requested relief: (1) the likelihood of RJF's success on the merits of its claims; (2) whether an injunction will prevent irreparable harm to RJF; (3) whether the potential injury that may be suffered by Defendants will outweigh the potential injury that will be suffered by RJF if the injunction is not granted; and (4) whether the public interest will be served by granting the injunction. *Nat'l Hockey League Players' Assn'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003). These four factors are not prerequisites that must be met, but rather factors to be balanced by the Court. *Id.*

Here, all of these factors support the issuance of a temporary restraining order ("TRO") and a preliminary injunction upon expiration of that TRO. Allowing WCI, Bain, and Warfield to breach their agreements with RJF, to threaten or actually misappropriate RJF's trade secrets, and to tortiously interfere with RJF's customer relationships will irreparably harm RJF based on the loss of its trade secrets, as well as its customers and associated goodwill. Accordingly, this Court must intervene and halt Defendants' on-going improper conduct.

A.  RJF is Likely to Succeed on the Merits of its Claims.

1.  *Breach of Contract*. To prevail on its breach of contract claim, RJF must establish: (1) the existence of the contract; (2) its performance under the contract; (3) WCI, Bain, and Warfield's contract breaches; and (4) damage or loss to RJF caused by the breaches. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3 (2002); *Nelson Jewellery Arts Co., Ltd. v. Fein Designs Co., Ltd., L.L.C.*, 2007 WL 4554448, *12 (9th Dist. 2007).

As discussed above, Bain and Warfield's Consulting Agreements contained restrictions on their usage of RJF's Confidential Information. (*See* Exhibits 3 and 4, paragraph 5). In paragraphs 1 and 2 of both the 2009 and 2012 Non-Competition, Non-Disclosure, and Non-Solicitation Agreements, WCI, Bain, and Warfield each acknowledged receipt of RJF's Confidential Information and agreed to refrain from using or disclosing such information. (*See* Exhibits 5 and 7, paragraphs 1 and 2).

Bain already has admitted that the 800 number used for RJF business was transferred to RJF's direct competitor, National and that National refused to stop using the number. (Exhibit 10). And, WCI appears to have kept the files and computer systems used by it that contain RJF's confidential and proprietary trade secret information in the same location, even though National now occupies that space – with WCI's former employees who now work for National. (*See*

9

Exhibit 8). Accordingly, WCI, Bain, and Warfield are in breach of their contracts by virtue of turning over the phone numbers to National, leaving open access to RJF's trade secret information, and leasing the space to National that formerly was used for RJF's business. RJF has a very high likelihood of success on the merits of its underlying contract breach claim; therefore, the Court should grant the requested injunctive relief.

   2. *Misappropriation of Trade Secrets*. To be entitled to an injunction under the Ohio Uniform Trade Secrets Act, RJF must establish: (1) the existence of a trade secret, and (2) that the trade secret has been misappropriated or there exists a threat of misappropriation. R.C. §§1333.61-1333.62.

In Ohio, a trade secret may consist of any drawing, pattern, design, or customer information which is used in one's business and provides a competitive advantage. R.C. §1333.61(D). A "trade secret" is information that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* Information can qualify for trade secret status and protection even where the information is not written down. *See e.g., Atlantic Tool & Die v. Kacic*, 1998 WL 801913, *3 (9th Dist. 1998); *Interstate Serv. Ins. Agency, Inc. v. McIntire*, 1991 WL 1386, *5 (1st 1991).

Several factors must be considered in determining whether particular information is a trade secret, with the two in bold constituting the heart of the test:

- **the extent to which the information is known outside of the business;**
- the extent to which the information is known by employees and others involved inside the business;

10

- **the extent of measures taken by the business to guard the secrecy of the information;**

- the value of the information to the business and its competitors;

- the amount of effort or money expended by the business in developing the information; and

- the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See, e.g., Valco Cincinnati v. N & D Machining Services*, 24 Ohio St. 3d 41, 44 (1986); *Pyromatics, Inc. v. Petruziello*, 7 Ohio App. 3d 131, 134-135 (8th Dist. 1983). The factors to be employed, and the weight attached to each factor, vary depending on the facts of each case. *See, e.g., The Proctor & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 273 (1st Dist. 2000).

When applying the above guidelines, the confidential information RJF seeks to protect constitutes a trade secret. First, RJF does not disseminate such information outside its business. Second, access to such information within RJF is restricted. Third, RJF has taken reasonable measures to safeguard the information through having employees and business partners execute agreements, limiting the information within the company on a need-to-know basis, explaining to employees the importance of maintaining confidential information through practices and policies, and conducting exit interviews reminding employees of their continuing confidentiality obligations. Fourth, the value of RJF's trade secrets is immeasurable; they are the essence of RJF's competitive edge and have been developed through countless work hours and hundreds of thousands of dollars of development. Finally, it would be extremely difficult for a competitor to properly duplicate RJF's trade secrets as they are not readily ascertainable.

Thus, not surprisingly, Ohio courts have afforded trade secret status to items nearly identical to those RJF contends are its trade secrets. *See, e.g., Sovereign Chemical Company v. Condren,*

1998 WL 195876, *4 (9th Dist. 1998)(holding customer list detailing customer history of purchases to be a trade secret, as well as the identity of plaintiff's supplier).

Ohio's Uniform Trade Secrets Act ("OUTSA") specifically mandates the injunctive relief RJF is seeking under the facts of this case. Specifically, OUTSA allows for an injunction to issue upon the showing of actual or threatened misappropriation of trade secrets. *See* R.C. §1333.62(A); *Valco*, 24 Ohio St. 3d at 47 ("[I]njunctions are, of course, the appropriate remedy to restrain the continued and future use, or threatened use, of misappropriated trade secrets."). Transferring the 800 number used for RJF's business to National creates an actual threat that RJF's customers are being diverted to its direct competitor. This was made possible by the acts of WCI, Bain, and Warfield and therefore, the first factor that the Court must consider – substantial likelihood of RJF succeeding on its claim of misappropriation of trade secrets – weighs heavily in RJF's favor.

    3.    *Tortious interference with Business Relations*. As set forth in the Verified Complaint, through WCI, Bain, and Warfield's misuse of RJF's valuable customer relationships and goodwill, National likely has and will continue to solicit competing business from RJF's customers thereby interfering with and disrupting RJF's business and diverting such business to National.

Ohio law recognizes a claim for tortious interference with business relations, the elements of which are: (1) the existence of a present or likely business relationship; (2) the wrongdoer's knowledge of that relationship; (3) the wrongdoer's intentional attempt to interfere with the relationship; (4) lack of justification; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, ¶1 of syllabus; *Andrews v. Carmody* (Lake Cty. 2001), 145 Ohio App.3d 27, 32.

RJF can prove all of the requisite elements of a claim of tortious interference. It has present relationships with its existing clients. WCI, Bain, and Warfield are aware of those relationships and have or will intentionally interfere with those relationships by assisting National in soliciting RJF's customers. WCI, Bain, and Warfield have no justification for doing so. RJF, therefore, has and will suffer damages from any resulting loss of business. Therefore, there is a likelihood of RJF's success on the merits of its tortious interference claim.

4. *Tortious interference with Contract*. Ohio law recognizes both the tort of intentional interference with a contract and the tort of intentional interference with a prospective contractual relationship. *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F.Supp.2d 1028, 1043 (N.D.Ohio 2003) *citing Gray-Jones v. Jones*, 137 Ohio App.3d 93, 100 (2000). Tortious interference with contract generally occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another." *Id.* at 1043 *quoting A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995).

To succeed on its claim for intentional interference with a contract, RJF will show: (1) the existence of a contract; (2) National's knowledge of the contract; (3) National's intentional procurement of WCI, Bain, and Warfield's contract breaches; (4) lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995).

In Bain's reply correspondence, he states that he contacted National regarding the 800 number and that National refused to transfer the line to RJF or cease using the line. (*See* Exhibit 10). At a minimum, this shows that National is aware of the relationship between WCI, Bain, and Warfield and RJF and the restrictions placed upon them through their contracts with RJF.

13

Further, based upon Bain's email correspondence, National is aware of the misappropriation of RJF's customers and refused to alleviate the continued misappropriation. Accordingly, RJF has a high likelihood of success against National on the tortious interference with contract claim.

B.    <u>Absent an Injunction RJF Will be Irreparably Harmed.</u>

RJF will suffer irreparable injury without the issuance of a temporary restraining order. "Irreparable harm sufficient to justify injunctive relief is comprised of 'substantial injury to a material degree coupled with the inadequacy of money damages'." *Warner Amex Cable Communications, Inc. v. American Broadcasting Companies*, 499 F. Supp. 537, 547 (S.D. Ohio 1980), (citing *Tully v. Mott Supermarkets, Inc.* (D.N.J. 1972), 337 F. Supp. 834, 850).

No legal remedy, regardless of how creatively fashioned, could possibly provide the comprehensive and sufficient relief that RJF deserves. WCI, Bain, and Warfield have chosen to do precisely that which they agreed to not do when they entered into the contracts with RJF. Damages are insufficient to compensate RJF for this improper conduct. RJF will lose its competitive advantage and will continue to suffer the loss and further erosion of its customer base and associated goodwill if Defendants are permitted to use RJF's trade secrets and Confidential Information to solicit sales for National.

C.    <u>The Potential Injury to RJF Outweighs any Potential Injury to Defendants.</u>

No appreciable harm will result to Defendants if injunctive relief is granted. WCI, Bain, and Warfield entered into contracts that clearly and unambiguously governed their rights upon the end of WCI's distributorship of RJF products. WCI, Bain, and Warfield were paid significant sums of money by RJF for the protections to which RJF is entitled. To the extent they may suffer some loss as a result of the relief requested by RJF, such loss would be the result of the willful breach of contract, misappropriation of trade secrets, and interference with RJF's

14

customer relations, committed by WCI, Bain, and Warfield. They, therefore, should not now be heard to complain about any perceived inequity arising out of RJF's requested injunction.

Further, contrary to Defendants' situations, the losses incurred by RJF as a result of Defendants' unlawful conduct could be devastating. RJF faces the real and substantial threat of the loss of business reputation, goodwill, and client relations. Consequently, this factor also favors granting injunctive relief.

D.  The Public Interest Would Be Served.

By granting the relief sought herein, the Court is furthering the vital public interest in fair competition. To deny injunctive relief is to sanction the use of other's trade secret information in order to gain an unlawful business advantage. Unfair competition, as recognized by Ohio courts, is detrimental to the public's well-established interest in free trade. The relief sought herein also will fulfill the public's expectation that businesses and individuals must compete fairly and lawfully, and that valid contracts will be enforced. Denying the relief sought can only frustrate those legitimate expectations. There is no public policy compelling a contrary result. Accordingly, the public interest favors the granting of the injunctive relief sought by RJF.

## IV. CONCLUSION

For the foregoing reasons, RJF International Corporation requests that this Court issue a Temporary Restraining Order and, upon expiration of that Order, a Preliminary Injunction, as requested in RJF's Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

*/s/ Christopher J. Carney*
Christopher J. Carney (0037597)
BROUSE MCDOWELL
600 Superior Avenue East, Suite 1600
Cleveland, Ohio 44114
(216) 830-6830 (telephone)
(216) 830-6807 (facsimile)
ccarney@brouse.com

and

Nicholas P. Capotosto (0076436)
BROUSE McDOWELL
388 South Main Street, Suite 500
Akron, Ohio 44311-4407
330-535-5711 (telephone)
330-253-8601 (facsimile)
ncapotosto@brouse.com

*Counsel for Plaintiff*
*RJF International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via Federal Express delivery, on this 30th day of May 2012 to:

WALLCOVERINGS INTERNATIONAL, INC.
1012 Campbell Road
Houston, Texas 77055

FRANK BAIN
13603 Lakeshore Way Court
Houston, Texas 77077

RONALD E. WARFIELD
19829 White Dove
Crosby, Texas 77532

NATIONAL WALLCOVERING, INC.
10020 Maumelle Blvd.
North Little Rock, Arkansas 72113

*/s/ Christopher J. Carney*
Christopher J. Carney (0037597)
Nicholas P. Capotosto (0076436)

[835771]